# Marcum v. Melton.

(Decided October 25, 1929.)

MARTIN T. KELLY and MURRAY L. BROWN for appellant.

ROY W. HOUSE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

Marcum, Melton, and 10 others, who also ran, were candidates for the Republican nomination for the office of jailer of Clay county at the primary election held August 3, 1929. On the face of the returns Marcum received 1,117 votes and Melton 1,123.

Melton was given the certificate of nomination and Marcum began this contest, by serving notice thereof on Melton on Monday, August 12, 1929.

The basis of Marcum's contest is that he received a plurality of the legal votes, that the returns fail to show all the legal votes he received, and that in making up these returns the election officers counted for Melton many illegal votes. The trial court heard the controversy on its merits and found 1,130 legal votes had been cast for Marcum and 1,107 for Melton, but the court dismissed Marcum's contest and did not award him the relief sought because he had not, as the court found, had his notice of contest served in time, a question which Melton raised by proper and timely steps. Marcum appeals and raises the questions we shall hereafter state and discuss.

When did this election close?

This is our first question, and the answer is: "At four o'clock p. m." August 3, 1929. See section 1550-3, Ky. Stats. The argument is made that there is no proof on this question, but proof is unnecessary, the closing is fixed by statute.

When should the commissioners count the votes?

This is question No. 2, and the answer is: Tuesday, August 6, 1929. See section 1550-26, Ky. Stats. By the provisions of this section the county election commissioners are required to meet on the third day after the close of the primary. That brings up another question.

How is this time to be computed?

The rules in this state is this: "Where the computation is to be made from the act done, the day on which the act is done must be included; but, if it is to be made from the day itself, the day must be excluded." Whitt

v. Howard, 210 Ky. 215, 275 S. W. 794; McKinster v. Shaffer, 186 Ky. 598, 217 S. W. 676; Logan County v. McCarley, 188 Ky. 706, 223 S. W. 1094, 1095; Meridian L. Ins. Co. v. Milam, 172 Ky. 75, 188 S. W. 879, L. R. A. 1917B, 103; cases listed in 38 Cyc. 319, under note 69; 26 R. C. L. p. 741, sec. 14, notes 1 and 2.

So far as we have been able to find there is but one domestic case to the contrary, and that opinion was written in 1848, and not a single supporting authority cited. It is Smith v. Cassity, 48 Ky. (9 B. Mon.) 192, 48 Am. Dec., 420. Four years thereafter this court, in the case of Chiles v. Smith's Heirs, 52 Ky. (13 B. Mon.) 460, criticized that opinion, refused to follow it, and announced the rule quoted above, citing in the opinion many supporting authorities, and to that rule we have since adhered.

What was the third day after the close of this election?

To answer this is a matter of no difficulty, if we know on what day to begin the computation. The beginning day of this computation is determined by whether the expression *after the close of this election* refers to the act of closing; that is, to the coming of the hour of 4 o'clock p. m. or to the day itself.

This is no longer an open question in this state. In Newton et al. v. Ogden et al., 126 Ky. 101, 102 S. W. 865, 31 Ky. Law Rep. 549, a local option election had been held on December 6, 1906, and the validity of that election was contested on the ground that it had been held within 30 days after the general election, which was held on November 6th. In that case we held the holding of that election on November 6th was an act, and in computing the 30 days following it November 6th was to be counted. If the holding of an election is to be treated as an act in the computation of time, then certainly the closing of this election was an act and the computation here must begin with and include August 3d.

Thus Saturday August 3d was one day, Monday the 5th was another, and Tuesday the 6th made the third. Hence the day for these commissioners to meet was Tuesday, August 6, 1929. In this computation we have excluded Sunday, August 4th, as it is a well-established rule in this state that if the time within which an act is to be done is more than a week, Sundays are to be included in the count; but if it is less than a week, Sunday is to be

excluded. Long v. Hughes, 1 Duv. 387; O'Brien v. Com., 89 Ky. 354, 12 S. W. 471, 11 Ky. Law Rep. 534; Roettger v. Riefkin, 130 Ky. 197, 113 S. W. 88; Geneva Cooperage Co. v. Brown, 124 Ky. 16, 98 S. W. 279, 30 Ky. Law Rep. 272, 124 Am. St. Rep. 388; Frazier v. Clark, 88 Ky. 200, 10 S. W. 806, 11 S. W. 83, 10 Ky. Law Rep. 786; Riley v. Grace, 33 S. W. 207, 17 Ky. Law Rep. 1007; Damron v. Johnson, 192 Ky. 353, 233 S. W. 745; Black Mountain Corp'n v. Jowdy, 207 Ky. 113, 268 S. W. 794.

Marcum cites the case of O'Brien v. Com., 89 Ky. 354, 12 S. W. 471, 473, 11 Ky. Law Rep. 534, where it is said: "The Criminal Code (section 283) provides: 'Upon verdicts of conviction in cases of felony, the court shall not pronounce judgment until two days after the verdict is rendered, unless the court be about to adjourn for the term.' This means juridical days, and Sunday should not be counted. The day of the rendition of the verdict is to be counted as one of the two days, because the time is to be counted from the performance of that act; but, as it says the judgment shall not be pronounced until two days thereafter, the appellant should not have been sentenced before Tuesday, unless the court was about to adjourn for the term."

From this he argues that if "until two days thereafter," when applied to O'Brien's conviction on Saturday, meant Tuesday, "on the third day after the close of any primary," as applied to the days following the primary held on Saturday, August 3d, necessarily means Wednesday, August 7th. He is mistaken, and the difference which he overlooks is found in the difference between the expression "until two days after the verdict," as used in section 283 of our Criminal Code of Practice, and "on the third day after the close of any primary" as used in section 1550-26, Ky. Stats.

The word until has been given in this state a meaning equivalent to until and including. We treat it as if used in the inclusive sense unless the intent to use it in another sense clearly appears. Thus where a defendant was given until the twenty-second day of the term to answer an answer tendered on the twenty-second was in time. See Combs v. Frick Co., 162 Ky. 42, 171 S. W. 999; Newport News & M. V. R. Co. v. Thomas, 96 Ky. 613, 29 S. W. 437, 16 Ky. Law Rep. 706; Louisville & N. R. Co. v. Turner, 81 Ky. 489; Cooper v. Lisle, 4 Ky. Op. 625.

The word "on," used in the expression "on the third day after the close of any primary," in section 1550-26, Ky. Stats., means the same as the word "during."

A contest very similar to this one is found in Batman v. Megowan et al., 58 Ky. (1 Metc.) 533. That case states the rule for computing time just as we have stated it here. The statute then required contestant to give notice of contest within 10 days after the final action of the board. The final action in that case occurred on August 6th, the notice of contest was given on the 16th, and the court held it was not given in time. Marcum overlooks that part of this old opinion and has seized on this, which is found near the close of that opinion: "That part of the statute, however, which directs the sheriff to deposit the pollbooks, within two days next after an election, evidently excludes the day of the election, and the two next or following days are the days referred to." A casual reading of this might give one the impression it was not in harmony with the earlier part of the opinion, but a careful examination will show it is. The explanation is to be found in the difference between the words "within 10 days after" and the words "within 2 days next after." The court in that opinion said of it: "This . . . may be regarded as one of the exceptions to the general rule, growing out of the peculiar language used, and the manifest intention of the legislature."

The election commissioners in the case at bar met on the 6th and began their work. They completed the canvass and tabulation of the results of the election in the races for representative, county judge, county attorney, sheriff, county clerk, jailer, tax commissioner, and coroner, and entered same on their records, and had completed the canvass and tabulation of the race for justice of the peace in one district, and as the hour was getting late they adjourned until the next morning, Wednesday, August 7th, when they reconvened, canvassed and tabulated the returns in the remaining magistrates' and constables' races, ascertained the results and entered that in their records, issued certificates of nomination in all of the races, and finally adjourned.

Marcum's notice of contest was served on Melton on Monday, August the 12th, and that brings up the principal question on this appeal.

Was this notice served in time?

The provision of section 1550-28 is: "Any candidate wishing to contest the nomination of any other candidate

who was voted for at any primary election held under this act shall give notice in writing to the person whose nomination he intends to contest, stating the grounds of such contest, within five days from the time the election commissioners shall have awarded the certificate of nomination to such candidates whose nomination is contested.''

After section 1550-28 became the law, there was enacted what is known as ''The Corrupt Practice Act,'' same being now sections 1565b1 to 1565b21 (Ky. Stats.) inclusive. By section 1565b7 the board of election commissioners is forbidden to issue a certificate to the successful candidate until after such candidate shall have filed the statement required by section 1565b6. This required this court to so construe section 1550-28 as to harmonize it with the later enactment. That was done in the case of Ward v. Howard, 177 Ky. 38, 197 S. W. 506, 509, in which opinion it was said: ''We think that when the election commissioners have canvassed and tabulated the vote and it is ascertained by this canvass and tabulation which candidate has received the majority of the votes, the opposing candidate may at once, and must within five days thereafter begin his contest proceedings, although no certificate of nomination has been issued.''

That opinion has been followed in the following primary election cases: Matthews v. Stephens, 177 Ky. 143, 197 S. W. 544; Lay v. Rose, 177 Ky. 303, 197 S. W. 921; Damron v. Johnson, 192 Ky. 350, 233 S. W. 745; Grubbs et al. v. Duffy et al., 230 Ky. 753, 20 S. W. (2d) 719.

We are again going to follow Ward v. Howard, but the moment we decide to do so this question arises:

When was the result of this primary ascertained?

Melton contends for August 6th, and Marcum for August 7th. If August 7th is the date this result was ascertained, then Marcum's contest was begun in time. If the result was ascertained on August 6th, it was not in time.

Melton relies on the opinion in the case of Grubbs v. Duffy, 230 Ky. 753, 20 S. W. (2d) 719; but if he will read that opinion carefully, he will see the election commissioners there had completed their work on the 6th and only returned on the 7th to complete their work in one specified race, that for county judge.

That certificate shows that the board had completed their work in the other races. The certificate in this case

has in it these words that distinguish it from the Grubbs case: "Not having finished at 4:30 P. M. we adjourn until Aug. 7th at 10 o'clock." What was it they had not finished? Officially they did not say, and in the Grubbs case they did. They now say when testifying as witnesses they had not finished counting the vote in some races for justice of the peace and constable, but they did not say that officially as a board, when they adjourned on August 6th.

The certificate of nomination issued to Melton bears the date of August 6, 1929, and in the adjourning order made at the close of that day the board says it had issued certificates to the successful candidates, but all that was attacked in this contest by Marcum for either fraud or mistake.

There is not a line of evidence tending to establish any fraud upon the part of the election commissioners. They fully expected to complete their work on the 6th and had this certificate of adjournment partially prepared at a time when they thought they would get through and the same is true of the certificates of nomination, but all of the evidence offered on the question shows that all nomination certificates were issued on the 7th, and the commissioners overlooked changing the dates from August 6th to August 7th. What they had done and what they had left undone, on August 6th, is explained by this which, officially they say, they did on the 7th:

"We the undersigned Election Commissioners of Clay Co. met this August 7th, at 10 o'clock pursuant to adjournment of the day before and proceeded to complete tabulation for the Primary Election Returns of Aug. 3rd, 1929, and issued certificates of nomination to the successful candidates "

"There being no further business we adjourn. "This Aug. 7, 1929."

The result of an election is ascertained when the board of election commissioners officially signs something indicating they have completed their work, something that deprives them of further control of the matter.

So far as we can tell from the certificates in this case, these commissioners may have adjourned over to the 7th for the very purpose of completing or of re-checking the count of the vote in the jailer's race. There was nothing in anything these commissioners had signed

that would prevent them from changing their figures if they had found on August 7th that they had, the day before, made an error in the race for any of these offices. Mistakes in addition are frequently made, and if these men had found on August 7th they had made a mistake in addition, or any other mistake, no one would say they could not correct it.

The same is true of any other error they might have discovered. Thus we find this case is like the case of Jones v. Cooper et al., 230 Ky. 566, 20 S. W. (2d) 458. There was nothing final and definite here signed by the commissioners, while in the Grubbs case there was.

Having reached the conclusion the result here was not ascertained until Wednesday the 7th, it follows that this contest was begun in time.

That brings us to the merits of the case.

The judgment recites that it was stipulated and agreed by the parties that the ballots had been properly preserved. Each party had asked that ballots be recounted in certain precincts. There were 30 precincts in the county. The court recounted 27 of these, and as a result of that recount it appeared from the ballots so recounted and from the returns in the precincts not recounted that the total votes received by these men are: Marcum 1,130 and Melton 1,107.

Neither party here contends the court should have recounted the ballots in the other three precincts, nor is there any objection to the action of the court in recounting the precincts that were recounted.

On this recount it was discovered there were 117 votes for Marcum and 150 votes for Melton given upon ballots that had been marked by a pen or a pencil.

Of course, no one can say or does say just why any particular ballot was so marked, but the election officers testify they generally marked ballots in this way for the assistance of illiterate voters. In a few instances such voters were sworn and on oath disclosed their right under section 1475 of the statutes to have their ballots so marked, but in almost all cases no such oath was administered.

There is no express provision in the primary election law for marking ballots for illiterate voters, and it is suggested all of these votes should be rejected. If that were done then the result would be Marcum 1,013, Melton 957.

In the election contest of Black v. Spillman, 185 Ky. 201, 215 S. W. 28, the recount of the ballots showed Black had 688 votes and Spillman 686. The trial court awarded the certificate to Spillman because 15 votes were included in this count for Black which the court regarded as illegal. This court on appeal did not decide whether section 1550-36 made section 1475 (a provision governing general elections) applicable to primaries or not, for if section 1475 did apply to primary elections then these votes must be deducted because section 1475 was not complied with, and if section 1475 did not apply then there was no provision in the primary election law by which an illiterate or otherwise incapacitated voter should vote. We shall not decide that question in this case, for if these marked ballots are included, Marcum is nominated, and if they are excluded his plurality is merely increased.

We are also urged to throw out the vote of Crane Creek voting precinct entirely, but there is no need to do that. The vote there, as found by the trial court, was Marcum 6, Melton 105, and throwing out this precinct would not affect the result further than to increase Marcum's plurality.

If section 1475 does not apply, Marcum's vote contains 117 illegal votes and Melton's 150, and these parties have proceeded upon the idea that it does apply and have taken a great deal of proof each trying to show illegal votes that should be deducted from the other. When a ballot has been cast, the candidate who received it should have it counted for him, unless it is shown the vote was illegal and was cast for the particular candidate.

It is not enough to say, "I think he voted for Smith." There must be some positive evidence the ballot was cast for Smith. There is no privilege of a citizen more sacred than the right to cast his vote untrammeled and unafraid, and to have that vote counted as cast. The candidate who is indicated as the voter's choice should not be deprived of that vote except for the gravest reasons.

We have gone over this evidence, and it is our conclusion Melton is shown to have received 39 such votes and Marcum 45. If those votes were deducted, the result would not be affected. Marcum would still have 1,085 and Melton 1,068. Marcum would still have a plurality.

Melton made motions to make more specific, and to strike out, that were never passed on by the trial court. He now insists these motions should have been sustained, but when he failed to insist on them and the court did not

pass on them, they were waived and are out of the case just as effectually as if he had been permitted to withdraw them by formal order of the court and he had then thrown them into the fire.

Marcum is adjudged to have received a plurality of the votes at the primary held August 3, 1929, is adjudged to be the Republican nominee for the office of jailer of Clay County.

Judgment reversed.

Whole court sitting.