## Hodges v. Murray.

(Decided June 19, 1931.)

HENRY H. DENHARDT for appellant.

LAURENCE B. FINN and JOHN H. GILLIAM for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

This is an election contest brought to us by J. P. Hodges (the Democratic nominee) who complains that the appellee, Eugene Murray (the Republican nominee), was erroneously adjudged to have been elected justice of the peace of the Hickory Flat district in Warren County, Ky., at the general election held Tuesday November 5, 1929. The board of election commissioners met to canvass the returns of this election on Friday November 8, 1929, they worked that day, finished the tabulation the next day, and, skipping Sunday and Monday, completed their work on Tuesday. The board found Murray had received 550 votes and Hodges 538 vots.

On Tuesday November 12, 1929, but two members of the board were present, but they completed their labors on that day and issued the 180 odd certificates of election to the successful candidates, and filed duplicates thereof in the clerk's office, but it appears these certificates are all dated November 9, 1929, and that Mr. J. T. Hobson, one of the commissioners who was not present on the 12th did not sign them until the 13th. On Thursday, November 21, 1929, Hodges began this contest asking for a recount of the ballots and making divers allegations, charges, and claims which we will state and dispose of as we reach them. A recount of the ballots, of which there is no complaint, was had by which Murray

gained one vote and Hodges three, thus making the total vote as shown by the recount, Murray 551, Hodges 541. A controversy soon arose about whether Hodges could introduce proof to show that the true date whereon this certificate was issued, was November 12th and not November 9th, and as the trial judge had indicated that he could, Murray filed an action in this court, wherein he sought to prevent his doing so. See Murray v. Simms, 232 Ky. 442, 23 S. W. (2d) 551. This court declined to take any action. The trial court properly considered the evidence offered upon this question. See Marcum v. Melton, 231 Ky. 244, 21 S. W. (2d) 291.

Upon the hearing of this case it was conclusively established the true date of the issue and delivery of this certificate was November 12, 1929. Hodges had to begin his contest within 10 days after the final action of the board, section 1596a-12, Ky. Stats. The final action of the board occurred when they, having issued a certificate of election, and filed it in the clerk's office, lost control of the matter and that was November 12, 1929, therefore this contest was begun in time. See Roberts v. Stumbo, 227 Ky. 334, 12 S. W. (2d) 1110.

This is not a collateral attack upon the official action of the board in dating this certificate November 9, 1929, hence section 3760, Ky. Stats., does not apply. The board is not by law required to date its certificates. See section 1596a-7, Ky. Stats. This date was not a matter about which the board was required to make a statement. Besides in the case of Ramey v. Ratliffe, 81 Ky. 468, we held that section 3760 (then section 17, c. 81, Gen. Stats.) did not apply to officers of an election.

### Pleadings.

In his petition filed November 21, 1929, Hodges charged that the following illegal votes, or votes cast illegally, had been received by and counted for Murray at Richpond, precinct No. 20, viz.: The votes of Roscoe Turner, Olden Boucher, and three other non-residents, three votes of unnamed voters cast openly on the table; three unnamed voters had exposed their ballots, and that three minors had voted.

Contestant made similar charges concerning other precincts as follows:

That at Woodburn, precinct 21, Herschel Meador, Mrs. Herschel Meador, and five other nonresidents, had

voted; that five unnamed voters had voted openly on the table; that 15 unnamed voters had exposed their ballots, and five unnamed minors had voted. That at Matlock, precinct 22, J. K. Kirby, K. R. Kirby, C. H. Board and five other nonresidents had voted for Murray, that five unnamed voters had voted on the table, that Cayce Jones and seventy others had exposed their ballots, and that five minors had voted.

That at Plano, precinct 23, nine named and five unnamed nonresidents had voted, that three had voted on the table, three had exposed their ballots, and two minors had voted.

That at Woodburn, precinct No. 47, Will Lewis, Mrs. Will Lewis, and five other nonresidents, Matt Robb, and two other table voters, three voters of exposed ballots, and two minors had voted. Hodges charged all these were illegal votes, and had been cast and counted for Murray.

In his answer filed November 26, 1929, Murray included a motion that Hodges be required to make this petition more specific by setting out the names of the voters who cast these alleged illegal votes. Without waiting for the court to pass on this motion, Hodges, on December 4, 1929, amended his petition and attempted to comply therewith. Hodges had stated his ground of contest defectively in his original petition; he had a right to perfect that defective petition: see Burke v. Greer, 197 Ky. 555, 247 S. W. 715. Murray was asking the court to require him to perfect it but, when he did so, Murray moved the court to strike it out, because it was, so Murray claimed, an effort to set up new ground of contest. The trial court erroneously sustained Murray's motion, and struck out contestant's amended petition.

We will take precinct 20, for example. In it Hodges alleged five nonresidents had voted for Murray. That was his ground of contest there, and so long as he did not exceed five such votes he was not making a new ground of contest. He was merely making more definite a ground of contest already indefinitely made. In his petition he named two of the five.

Hodges was entitled to name the other three but instead of doing that only, he named eight. The court should have limited him to three and should have required Hodges to elect, or Hodges should have voluntarily elected, which three names he would rely on, and,

in the absence of anything of that kind, the court should have treated the first three names given in the amended petition as the ones upon which he could rely in this precinct, and should disregard the names given later and in like manner he should not consider the names of any parties given in the amended petition as to other precincts, after the number given in the original petition is exceeded. Thus these pleadings so treated charge that Murray received, and there were counted for him, the following illegal votes:

At Richpond, precinct 20, the vote of Flossie Fox, a minor, and the votes of Roscoe Turner, Olden Boucher, Willie Smith, Thurman Woods, and J. T. Harrison, alleged nonresidents.

At Woodburn, precinct No. 21, the pleadings charged Murray with the receipt of the votes of Travis Alraid, a minor, G. T. Kelley and C. P. Martin, exposed ballots, and the votes of Herschel Meador, Mrs. Herschel Meador, Vernon Stallard, Clara Stallard, Clay Bailey, C. C. Thomas, and Garland Howard, alleged to be nonresidents.

At Matlock, precinct No. 22, the charge is that Murray received the votes of Clay Johnson, a minor, of Cayce Jones, who exposed his ballot, and of K. R. Kirby, J. R. Kirby, C. H. Board, Millard Blewett, Mrs. Lige Ford, Lige Ford, H. E. Chaffin, and Hubert Cook, alleged to be nonresidents.

At Plano precinct No. 23, the charge is that Murray received the votes of the following alleged nonresidents: A. P. Miles, Mrs. A. P. Miles, Bige Sadler, Mrs. Bige Sadler, Ida Sadler, Lucy Sadler, Rudolph Barton, T. B. Crawford, Sarah Crawford, J. L. D. Blankenship, Hattie Blankenship Tuck, Gee Blankenship, Emily Freeman, and W. R. Barton.

At Woodburn, precinct No. 47, the charge made by the pleadings is that Murray received the following illegal votes: That of Alice Mary Johnson, a minor, Matt Robb, who voted on the table, and the votes of the following alleged nonresidents: Will Lewis, Mrs. Will Lewis, Dora Duff, T. S. Moore, Monme Squall, W. T. Tresch, and Thos. Lloyd.

We shall give below our conclusions and the names of the voters whose votes must, under the pleading and proof, be deducted, and from whom, and have indicated

why by the letters N. R. for nonresidents, and O. V. for an exposed ballot or vote cast on the table without the voter being sworn.

Deduct from Hodges:
    Herschel Meador N. R.
    Mrs. Herschel Meador N. R.

Deduct from Murray:
    Roscoe Turner N. R.
    *Olden Boucher* N. R.
    C. P. Martin O. V.
    *C. C. Thomas* N. R.
    J. R. Kirby N. R.
    K. R. Kirby N. R.
    Lige Ford N. R.
    Mrs. Lige Ford N. R.
    Mrs. A. P. Miles N. R.
    Hattie B. Tuck N. R.
    Matt Robb O. V.
    Will Lewis N. R.

Every one of these were found by the trial court to be illegal votes for the same reasons we have given, except Olden Boucher and C. C. Thomas, whose names we have italicized. The trial court charged Hodges with the votes of Ewing Schloss, Bill Shirley, J. L. D. Blankenship, Will Lewis, Fred M. Collett, Alice Mary Johnson, A. M. Downey, and Mr. and Mrs. Meador.

We shall now consider them. As to the votes of Ewing Schloss and Bill Shirley, the court erred in deducting them, as no one had charged they were illegal voters. We have concluded the vote of J. L. D. Blankenship should not be counted against any one. He was on the stand three times and interrogated in an effort to get him to say how he voted, but without success. The court required him to answer, and he said he voted the Republican ticket, but scratched his itcket so as to vote for Hodges. This man first said he voted under the Democratic emblem, later that he voted under the Republican emblem. His activity for Murray was shown; that he was acting in concert with Murray plainly appears from the evidence, and we feel his vote should not be counted against any one.

We have also relieved Hodges of the votes of A. M. Downey and Fred M. Collett charged to him by the trial

court. They were illegal voters, but under our construction of the pleadings no one had challenged their votes, as their names are given after the number stated in the original petition had been exceeded. The trial court charged Hodges with the vote of Alice Mary Johnson, who voted in precinct No. 21. No one had challenged her vote in that precinct. There was a challenge of the vote of an Alice Mary Johnson as a minor in precinct No. 47; but no challenge of such a voter in precinct No. 21.

In precinct 47, the trial court charged Hodges with the vote of Will Lewis, and of this action Hodges complains. Will Lewis admits he was working for the election of Murray, that he worked for Murray in the campaign, that he had offered to bet on Murray, that on election day Murray rode with him to Richpond precinct, and that he had had difficulty with a son of Hodges. When asked how he voted, counsel for Murray objected, and Lewis refused to answer. Later he was recalled and required by the court to answer, and he said he voted for Hodges. Mr. J. H. Turner testified he had a conversation with Will Lewis about this statement that he had voted for Hodges and that he said to Lewis: "Will, you didn't do it, did you?" To which Lewis replied: "Hell, no." The court is not bound to believe every statement a witness makes, especially when his evidence bears as many suspicious marks as does the evidence of Mr. Lewis, and we believe he told the truth to Turner and did not tell the truth when he was on the stand, and we have deducted his vote from Murray.

These leave Hodges charged with the votes of Mr. and Mrs. Meador. They were nonresidents. They voted in precinct 21. There is grave doubt about how they voted; they said they voted for Hodges, yet the evidence shows they were for Murray, but the chancellor found they voted for Hodges, and we shall not disturb his finding. Hodges contends the votes of Mr. and Mrs. Meadeor should not be deducted from his total because Murray had filed no counter contest, but these votes must be charged to him under our ruling in Drennan v. Roberts, 234 Ky. 574, 28 S. W. (2d) 735. He makes a vigorous attack on that opinion and asks us to overrule it because, so he says, it gives to unscrupulous parties, who voted illegally for the contestee, power to do contestant still further harm, after it has been shown they had voted illegally, by then saying they had voted for contestant. Hodges says, and it is true, that but for the application

of the rule announced in Drennan v. Roberts, he is elected. He complains most bitterly of this rule, but it has made practically no change that necessarily affects him.

He had charged that Mr. and Mrs. Meadors had no right to vote in this precinct, and they had not, for they did not live within it. He charged they voted for Murray, and they did tell, it seems, two or three people they had done so, and there is some evidence they were interested in the election of Murray, but they testify they said these things jokingly, and that they voted for Hodges. The purpose of Hodges was to secure the deduction of these two votes from Murray's total. Under this evidence, previous to the adoption of the rule announced in Drennan v. Roberts, these votes would have been deducted from no one, but under that rule they must be deducted from Hodges. This Hodges says, places him at their mercy and does him a great injustice against which he is helpless; but he was not helpless. Contestant could have relieved himself of all discomfiture resulting to him from the opinion in Drennan v. Roberts, by withdrawing his charge that they were illegal voters or had voted illegally.

A litigant can at any time before final submission withdraw a pleading or a part of a pleading. Carsen v. Kelly, 236 Ky. 690, 33 S. W. (2d) 708. As Murray had filed no counter contest naming these voters as being illegal, such a withdrawal would have left these votes unchallenged. Of course the rule would be otherwise if Murray had challenged these votes, for Hodges could not withdraw a pleading filed by Murray.

We have taken from Murray the vote of Olden Boucher. He is a single man 23 years of age, who was born and reared in Allen county, who voted in that county in 1928, who says his home is in Allen county with his parents, and who was temporarily in Warren county, voted for Murray, and who has since returned to Allen county.

We have charged Murray with the vote of C. C. Thomas. Thomas lives with his wife on Twelfth street in Bowling Green and has lived there for eight years. If he wants to vote he should vote there, yet he came out to this precinct and voted for Murray.

There were five other voters, whose votes are challenged by these pleadings as we construe them whom we

shall now discuss. They are: Mr. and Mrs. T. B. Crawford who formerly lived in Warren county, but moved with their family to Scottsville in Allen county in 1928; everything indicates they intended to make that their home. Mr. Crawford has been a cropper and a mover and when he went to Allen county he went there to accept employment in a store conducted by his brother-in-law. They left no property, real or personal, in Warren county, except a dining table, which they loaned to another brother-in-law, and a box of fruit cans which they also left with him. Mr. Crawford's health failed and the 20th of May they came back to Warren county, but not to the place they had left. Mrs. Crawford says he moved to Scottsville temporarily, and that he intended to return some time. His health was affected by the confinement in the store, and some time about the middle of May his brother came to see him and proposed to him that he come back to Warren county and take over a trade he had made, and finish making a crop his brother had started in Warren county on Mr. Wallace's farm. The proposition appealed to Crawford, he opened negotiations with his brother and Mr. Wallace, which ripened into a trade, and he returned. The question is, had Crawford done enough in moving to Scottsville to make that his residence. A man changes his residence when he removes to a new location with intention to make that his home. A man may accomplish such a change in an hour's time, and when a man removes to a new location with the intention of making his home there indefinitely he has changed his residence, even though he may all the time have entertained a floating intention at some future time to return to his former abode. Baker v. Baker et al., 162 Ky. 683, 173 S. W. 109, L. R. A. 1917C, 171. Gilbert v. David, 235 U. S. 569, 35 S. Ct. 164. 59 L. Ed. 360.

This man's evidence makes it clear that if his health had not declined he would have continued in Scottsville. As he expressed it, "I just kept hanging on." It is clear from his evidence that if Mr. Crawford's health had permitted, and he had not met with this fortuitous opportunity to return to Warren county and buy out a crop his brother had pitched, he would still be hanging on in Scottsville. His status cannot be distinguished from that of Mr. Worthington who was held to be an illegal voter in Siler v. Brown, 215 Ky. 199, 284 S. W. 997. These

people had no right to vote in Warren County at this election as it occurred within six months after their return to the county.

Rudolph Barton, or W. R. Barton, lived in Tennessee all his life except about 15 months between December, 1926, and March, 1928, when he lived in Matlock precinct, Warren county. In March, 1928, he went to Old Hickory, Tenn., with his parents. He had a position in a silk mill there. In June, 1929, he married a Miss Freeman and moved to the home of his mother-in-law in Plano precinct. Clearly this man had no right to vote. See section 145, Ky. Constitution.

Bige Sadler and wife had formerly lived in Plano precinct. He left in 1924, and his wife left in 1917. He has since 1924 lived in Central City, Bowling Green, and Glasgow. He said he called Glasgow his home when he lived there. He was listed for poll tax in Bowling Green in 1927 and 1928. His wife said he left Glasgow because there was no work there then. He had not lived in Plano precinct from 1924, until August 12, 1929, when he returned. This was less than six months before this election.

These five people had no right to vote in this election. They refused to say how they voted, the court declined to make them say how they voted, whereupon Hodges made an avowal that if required to answer they would say they were Republicans and had voted for Murray. In brief filed in this court, counsel for Hodges says: "If this were a common law action, the court would consider this avowal for the purpose of determining the probative effect of the excluded evidence and from that whether or not its exclusion was prejudicial, but in an equity case, this Court enters such judgment as the record justifies. If evidence is improperly excluded in an equity case and what that evidence would be, is properly manifested by an avowal we are firmly of the opinion that this court should receive and treat the avowal as the evidence of the witness, else the litigant making the avowal would be, by the erroneous action of the lower court in excluding it, entirely deprived of the benefit thereof. Hodges took every necessary and possible step to get this evidence into the record. See 3 C. J. p. 825, sec. 736. Murray by objecting is in the position of suppressing the evidence, and one taking such a position should by no means be a favorite of the courts. Cer-

tainly the presumption is against Murray as regards the exclusion of this evidence." 22 C. J. p. 124, sec. 60.

I find this in 2 R. C. L. p. 283, sec. 238:

> "An appeal in equity from a final decree rendered on an issue of fact brings up the whole case for trial anew in the appellate court on the transcript and evidence accompanying it, and a final decree is usually rendered in the appellate court. . . . Where improper evidence was admitted by the trial court, the judgment will not be reversed on that ground, but the appellate court will disregard such testimony as it finds incompetent and render judgment as equity and justice may require on the pleadings and the evidence which was properly admitted."

We respectfully suggest and urge that this court should now write this into the law:

> "Where proper evidence is offered, by a litigant in an equity case and its introduction is objected to by his adversary, his objection is sustained by the court and the litigant by proper avowal manifests what that evidence would be and his adversary still objects, and the court still refuses to admit it, this court on appeal if convinced the offered evidence should have been admitted, will in an equity case treat the avowal as true and as the evidence of the witness and will render judgment as though the witness had answered as set out in the avowal."

> "Unless such a rule is established, the stealing of elections will become a matter of but little difficulty."

We do not regard this suggestion as sound, and regard it as safer to reverse a case under such circumstances and give the aggrieved litigant an opportunity to produce his evidence.

We have found that under the present state of the pleadings and proof two votes must be deducted from the total vote of Hodges as shown by the recount, which leaves his vote 539 and that twelve votes must be deducted from Murray's total which leaves him 539. Thus neither of these men received a majority, and the court erred in adjudging Murray to have been elected.

Therefore, the judgment must be reversed. The court will set it aside and will set aside the order of sub-

138

mission, award Hodges process to obtain the attendance of these five voters, and the court will require them under oath to state their political affiliation, and to say how they voted between these litigants. These parties may, also, if they can, show how these five people voted by circumstantial evidence. See Tunks v. Vincent, 106 Ky. 829, 51 S. W. 622, 21 Ky. Law Rep. 475; 20 C. J. p. 247 sec. 341, 9 R. C. L. p. 1149 sec. 141. The case may then be submitted for judgment. Judgment reversed.

The whole court sitting.